**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re: ) | |
| ) | Chapter 13 |
| Randall Haskell, ) | |
| ) | Case No. 04-11037 |
| Debtor ) | |
| ) | |

# MEMORANDUM OF DECISION

## INTRODUCTION

The Debtor, Randall Haskell, was convicted in 2001 of sexually abusing Jenna Berry when she was a minor. Berry holds an unliquidated tort claim against Haskell arising out of the misconduct which led to that conviction. Before me is Berry's opposition to confirmation and her motion to dismiss the case. The allowance, value, and dischargability of Berry's claim are not to be decided at this time. Yet, implicit in the present contest is Berry's overarching concern that her claim may be discharged under Chapter 13 because, ordinarily, claims like hers do not fall within the limited exceptions to discharge found in 11 U.S.C. § 1328.[1] An evidentiary hearing was held on March 28, 2005.[2] For the reasons presented below, the plan will not be confirmed and the case will not be dismissed. This memorandum contains my findings of fact and conclusions of law pursuant to Fed. R. Bankr. Pro. 7052.

## JURISDICTION

This is a core proceeding in which final judgment may enter pursuant to 28 U.S.C. § 157(b)(2)(K) and § 1334(b).

---

[1] Unless otherwise indicated, all references to statutory sections are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

[2] The Chapter 13 trustee did not support dismissal of the case, but he did not support confirmation of the current plan.

## **BACKGROUND**

The Debtor works as a sales manager at D&H Motors, a family owned automobile business in which he holds a 20% interest. The current inventory of the business is roughly 7-9 new cars, and 18 used cars. The Debtor also holds a 20% interest in D&H Leasing, another family owned business that owns buses. We do not have a clear picture of D&H Leasing and do not know the number of buses it owns, their condition, or their value. There may be three buses or as many as nine. The Debtor's minority interest in each of these family businesses is shown on his bankruptcy schedules as having a value of $5000.

The Debtor's gross annual salary from D&H Motors is around $28,500. There is no indication of income from D&H Leasing. His wife's gross annual salary as a seventh grade language arts teacher is $49,270. The family derives additional income from the Debtor's private piano lessons, sales incentives from Ford Motor, and rental income from a time share condominium. By the nature of its components, their additional income will vary from month to month and year to year. For example, the statement of affairs shows the Debtor's Ford Motor incentives to be $2,085 in 2003 and $623 in 2002. Schedule I shows projected monthly net income from all sources for the Debtor as $2,062 and $3,466 for his wife for a total of $5528. Annualized, the projected net income from all sources would be $24,744 for the Debtor and $41,598 for his wife. Combined, their projected annual net income appears to be $66,342.

The family residence in Manchester, Maine is owned jointly by the Debtor and his wife. It was built in 1996 at a cost of $315,000. The value of the residence shown by the Debtor on his original bankruptcy schedules is $330,000. Those schedules were filed on May 26, 2004 along with the petition commencing the case. On July 16, 2004, the Debtor filed a memorandum

explaining that the scheduled value of $330,000 was based upon an appraisal of just over $400,000. In that memorandum he states that the value of his interest would be $165,000 (one-half of $330,000) and that the difference between the alleged appraised value and $330,000 is the sum of deductions for anticipated roof repairs, a brokerage fee, and a Chapter 7 trustee's fee. No separate amounts were given for each of those deductions. On March 18, 2005, the Debtor filed an amended schedule showing the value of his one-half interest in the residence to be $201,500.

At trial the Debtor explained that his amended schedule showed the value of his one-half interest to be one-half of $403,000, the value appearing in an appraisal dated February 13, 2004, without any deductions for roof repairs, a broker's fee, or a trustee's fee. Two other appraisals came to light at trial: one dated October 5, 1998 showing the value of the residence to be $305,000 and another dated March 26, 2004 showing a value of $450,000. All three of the so-called "appraisals" admitted into evidence appear to be the face sheets from what may have been more extensive reports. No written analysis or expert testimony was offered by either party.

The current balance of the mortgage debt on the residence is approximately $250,000.

The Debtor and his wife also own a time share condominium at the Sunday River resort in Newry, Maine which they jointly purchased in 1993 for $32,000. Its value, as opposed to the value of the Debtor's one-half interest, is shown on the schedules as $25,000. This property is burdened with secured debt of approximately $15,000.

## DISCUSSION

Berry's grounds for opposition to the plan and dismissal of the case are that: (1) the plan was not filed in good faith; (2) the plan is not feasible; (3) the plan fails to meet the liquidation test; and (4) less than all of the Debtor's disposable income has been assigned to the plan. The Debtor has the burden of proof on confirmation and must show that each of the requirements under §1325 has been met by a preponderance of the evidence. Berry has the burden of proof on her motion to dismiss the case by a preponderance of the evidence.

### Good Faith

To be confirmed a Chapter 13 plan must be proposed in good faith. § 1325(a)(3). "The meaning of good faith is simple honesty of purpose." In re Keach, 243 B.R. 851, 853 (1st Cir. BAP 2000). Honesty, with respect to confirmation, relates to a debtor's post-filing conduct. Id. Pre-filing conduct, unrelated to a plan, is not at issue under § 1325(a)(3). Id.

Berry contends that the Debtor's plan lacks good faith because he has undervalued his interests in the family residence and the time share condominium and because he has failed to include gifts from his wife's family as available income. Berry views these alleged lapses to be evidence of a lack of good faith.

We begin with valuation. Accuracy, with respect to value of property, is not necessarily the deciding factor in determining a debtor's good faith under § 1325(a)(3). The value of an asset may be contested and, thus, a debtor's notion of value may be offered in good faith even if it differs from other views. The "simple honesty of purpose" test will be met if there is a cogent basis for the value given by a debtor and there is no demonstration of deceit or misrepresentation of fact. Adverse parties may pursue discovery and challenge a debtor's

estimate of value with valuation evidence of their own.  When there are competing opinions of value the court may arrive at a value by applying the appropriate legal standard to the evidence.  When property is to be retained by a Chapter 13 debtor that standard is replacement cost.  See Associates Commercial Corp. v. Rash, 520 U.S. 953, 963 (1997).

> Of prime significance, the replacement-value standard accurately gauges the debtor's "use" of the property.  It values "the creditor's interest in the collateral in light of the proposed [repayment plan] reality: no foreclosure sale and economic benefit for the debtor derived from the collateral equal to . . . its [replacement] value."

Id. (internal citations omitted).

   Here, the issue is not the value of a secured claim under § 506(a) and § 1325(a)(5) as it was in Rash.  Instead, the challenge comes from Berry, the holder of a general unsecured claim, who is concerned with the value of this Debtor's equity in jointly held property.  We are presented with the flip side of Rash, but the legal standard is the same.  The value of property to be retained by a Chapter 13 debtor is its replacement value.  Thus, under the Rash standard, the value of a debtor's interest in property should not be reduced by a broker's fee or a trustee's fee.  Costs of remediation may be deducted if it is shown that the economic benefit to be retained by a debtor is affected by a deteriorating condition.

   The Debtor did not use the correct legal standard in arriving at the value of his interest in the residence given in the original schedules.[3]  He deducted broker's fees, trustees fees and costs of remediation for roof repairs from the $403,000 appraisal.  Deduction of broker's fees and trustee's fees shows an intention to present the liquidation value of his interest on the

---

[3] As discussed below, liquidation value is employed for purposes of determining best interest of creditors test under § 1325(a)(4).  Liquidation value may be calculated by deducting various factors from replacement value.  Depending on the circumstances, these factors may include broker's fees, trustee's fees, legal fees, exemptions, and quick sale discounts.

schedules.  No satisfactory explanation was offered for his deduction of projected roof repairs in light of his reliance upon an appraisal that may have accounted for structural defects.  However, apart from these errors, the record shows a cogent basis for his initial scheduled value.  Moreover, there is nothing in the record to suggest that these errors or the Debtor's selection of the $403,000 appraisal over the $450,000 appraisal were intended to deceive creditors or misrepresent facts.  Both appraisals were supplied within the same time frame.  Neither one was amplified at trial by any party with written analysis or expert testimony.  The Debtor was free to adopt either appraisal (or neither) as the foundation of his notion of value.  See Robinson v. Watts Detective Agency, Inc., 685 F. 2d 729, 739 (1st Cir. 1982) (an individual owner of property is competent to testify on the question of value).

Berry offered nothing beyond the mere existence of the $450,000 appraisal to show that the Debtor's reliance upon the lower appraisal lacked good faith.  "[B]ad faith generally requires concealment of an asset or an exemption of which creditors have no knowledge, and thus no opportunity to investigate . . . there must be some form of deception."  McFatter v. Cage, 204 B.R. 503, 508 (S.D. Tex. 1996)).  Berry had an opportunity to investigate and she did.  The record does not support a conclusion that the use of the lower appraisal by the Debtor was deceitful or a misrepresentation of fact.

The Debtor has met his burden of good faith with respect to the residence.  I find and conclude that the replacement value of the Debtor's interest in the residence is $201,500.

Berry also contends that the Debtor understated the value of the time share condominium at Sunday River.  The Debtor and his wife have a contractual right to occupy the condominium for 13 weeks a year.  They purchased that right in 1993 for $32,900.  The

scheduled value of the unit is $25,000.  The Debtor's testimony is that the scheduled value reflects his understanding of the value of other units in the same development.  On cross-examination, he admitted that some units in the same building have sold in the range of $31,000 to $36,000.  He also said that the value of a unit depended upon its size and condition.

Again, the "simple honesty of purpose" test will be met if there is a cogent basis for the value given by a debtor and there is no showing of deceit or misrepresentation.  The valuation of property is not an exact science and I am satisfied that the Debtor's consideration of size, condition, and sales prices of other units shows a cogent basis for his statement of value.  Reasonable people may differ and his insistence that his unit is worth $6000 less than the lowest sale price for a unit in the same building could reflect, as the Debtor suggests, a difference in size and condition.  Therefore, I conclude that the Debtor's opinion of value does not violate the simple honesty of purpose test.  Nonetheless, I am unwilling to accept his opinion as the value of the unit.  With little else to go on in the record beyond the Debtor's opinion and the range of sale prices for units in the same building, I will accept $31,000, the low end of that range, as the value of the unit.  Thus, the replacement value of the Debtor's interest in the time share unit is $15,500.

Berry's last argument on lack of good faith is that the Debtor has failed to include gifts from his in-laws in his calculation of family income.  There is evidence that Mrs. Haskell had received gifts from her parents on a fairly regular basis.  But there is no evidence of the value or frequency of those gifts.  On this record I am unable to conclude that there is a lack of good faith in the Debtor's omission of future gifts from his calculation of future income.

**Feasibility**

A plan is feasible if a debtor demonstrates that he is able to make all of the payments under the plan. § 1325(a)(6); Till v. SCS Credit Corp., 541 U.S. 465, 480 (2004).

The net monthly income of the Debtor's family is $5,528. Their monthly expenses total $4,943. The surplus is $585. These figures were not seriously challenged at trial. The Debtor's plan proposes to pay $300 per month for 48 months ($14,400), plus another $12,400 from the sale of non-exempt assets, for a total of $26,800.[4] The Debtor's plan is feasible, but not confirmable because it does not comply with the best interest of creditors test under §1325(a)(4).

**Liquidation Test**

Under § 1325(a)(4), a Chapter 13 plan must provide for a distribution to the holders of unsecured claims that is no less than the distribution they would receive in a Chapter 7 liquidation.[5]  Barbosa v. Solomon, 235 F.3d 31, 34 (1st Cir. 2000). This is known as the best interests of creditors test.

The plan proposes a distribution to the holders of general unsecured claims based upon monthly payments of $300 for 48 months and the proceeds of sale of several assets including 200 shares of D&H Motor stock, 50 shares of Principal Financial Group, a jet ski, a saxophone,

---

[4] No feasibility challenge was raised with respect to the sale of non-exempt assets.

[5] Section 1325 provides:

> (a) Except as provided in subsection (b), the court shall confirm a plan if
> ...
> (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date...

and a tuba.  No showing was made by any party that the distribution resulting from the sale of these assets by the Debtor in the Chapter 13 case would be different from a distribution following a sale of the same assets by a Chapter 7 trustee.  Consequently, we are left with the question of whether creditors would be better off with the Debtor's $14,400 stream of payments over four years or the liquidation value of property of the estate that the Debtor wishes to retain, namely his interest in the residence and his interest in the time share.

      The replacement value of the Debtor's interest in the residence is $201,500.  To arrive at the liquidation value of his interest, we will deduct a broker's commission (assumed to be 6%, or $12,090), one-half of the balance due on the mortgage ($125,000), the value of the Debtor's state residence exemption ($35,000), and a Chapter 7 trustee's commission ($3,691).  These deductions result in a liquidation value of $25,719.  To arrive at a liquidation value of the Debtor's interest in the time share unit we would start with the replacement value of $15,500, deduct a broker's commission ($930) and one-half of the secured claim ($7500).  After deducting a Chapter 7 trustee's commission of $707, we would be left with a liquidation value of $6363.  The sum of these liquidation values is $32,082, more than twice the proposed Chapter 13 distribution of $14,400.  Admittedly, this is a very rough comparison.  To arrive at a more precise comparison we would need to consider further deductions for quick sale discounts, legal fees, closing costs, and other expenses.  But those additional costs and expenses would have to approach $18,000 to bring the plan into compliance.  That is not likely to happen.  A more precise analysis may also include some value on the Chapter 7 side for monthly plan payments through the effective date of the plan and a deduction of a fair discount rate from the

proposed Chapter 13 distribution.[6] Despite these shortcomings in our analysis, I am convinced that the Debtor's plan does not meet the best interests of creditors test.

### Assignment of All Disposable Income

For a plan to be confirmed, a debtor must show that all of his projected disposable income for the period of the plan is devoted to plan payments. § 1325(b)(1)(B); Watson v. Boyajian (In re Watson), 403 F.3d 1, 7 (1st Cir. 2005). Disposable income means income that is not reasonably necessary for the maintenance or support of the debtor or his dependants. § 1325(b)(2)(A); Watson, 403 F.3d at 7. A debtor has the burden of demonstrating that an expense is reasonably necessary. Watson, 403 F. 3d at 8.

At the hearing, Berry raised the question of whether Mrs. Haskell's disposable income should be included in the plan. There is authority for Berry's position. See e.g., In re Bottorff, 232 B.R. 171, 173 (Bankr. W. D. Mo. 1999)( "bankruptcy courts in other jurisdictions have consistently interpreted § 1325 to require the consideration of a non-debtor spouse's income in determining the debtor's disposal (sic) income and, ultimately the debtor's good faith in proposing the Chapter 13 plan."). But there is no need to answer Berry's question at this time. If the liquidation test is to be met, the value of the Debtor's distribution will have to increase. Applying Mrs. Haskell's disposable income to the plan may be one way of fixing that problem.

### CONCLUSION

Berry's motion to dismiss the case will be denied and confirmation of the plan will be denied. The Debtor shall have 30 days from the date of the order denying confirmation of the plan to file a revised plan and notice the same for hearing. Failure to file a revised plan and

---

[6] The Debtor's plan does not address his D&H Leasing stock and whether that stock is to be retained or sold. Disposition of that stock may be relevant to future liquidation analysis.

notice it for hearing will result in dismissal of this case without further notice or hearing.  A separate order will issue.

Dated: January 18, 2006

_____
Louis H. Kornreich
Chief Judge, United States Bankruptcy Court